IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

SAUK PRAIRIE CONSERVATION ALLIANCE,

                            Plaintiff,

      v.

U.S. DEPARTMENT OF THE INTERIOR,
SALLY JEWELL, NATIONAL PARK SERVICE,
MICHAEL REYNOLDS, U.S. GENERAL SERVICES
ADMINISTRATION, and DENISE TURNER ROTH,

                            Defendants,

      v.

STATE OF WISCONSIN,

                         Intervenor defendant.

OPINION & ORDER

17-cv-35-jdp

---

This case involves a dispute over the proper use of the Sauk Prairie State Recreation Area, which is located on the lands of the former Badger Army Ammunition Plant in Sauk County, Wisconsin. The federal government transferred the land to Wisconsin over a period of several years, beginning in 2009 and ending in 2016.

Plaintiff Sauk Prairie Conservation Alliance says that the recreation area should be limited to "low impact" uses, such as hiking, birding, and bicycling and it objects to a plan prepared by the Wisconsin Department of Natural Resources and approved by the National Park Service that allows dog training and dual-sport motorcycle events. The Alliance also objects to allowing the Wisconsin National Guard to continue its longstanding practice of conducting helicopter training on a portion of the property. The Alliance contends that the federal government violated both the Federal Property and Administrative Services Act (FPASA) and the National Environmental Policy (NEPA) when it allowed these uses.

Both sides have moved for summary judgment. Dkt. 47 and Dkt. 61. The court will grant defendants' motion and deny the Alliance's motion because the Alliance has failed to show either that the National Park Service (NPS) lacked authority under FPASA to approve the proposed uses for the recreation area or that it was arbitrary and capricious for NPS to conclude under NEPA that the proposed uses would have no more than a minimal impact on the environment.

UNDISPUTED FACTS

The facts are taken from the administrative record and are undisputed.

**A.  History of the recreation area**

The Sauk Prairie State Recreation Area is made up of 3,385 acres of land in Sauk County, Wisconsin. The area was once part of the Badger Army Ammunition Plant, which covered more than 7,300 acres. **R. 3870 and 3876**. Beginning in World War II, the plant was used to manufacture military propellants, but the plant ceased operating in 1975 and the army decommissioned the land in 1997. **R. 3869 and R. 3987–88**.

The industrial activities at the plant caused contamination from asbestos, lead paint, PCBs, and oil in the buildings, sewer systems, and groundwater. The Army has undertaken efforts to remediate the contamination, so the land now meets the requirements to be used as a recreation area, **R. 3873**, but there is still "an extensive invasive species problem," **R. 3892.**

Plaintiff Sauk Prairie Conservation Alliance is a non-profit corporation located in Sauk County that promotes education and cooperative conservation on the former Badger Army Ammunition Plant lands and in the surrounding Sauk Prairie area. The Alliance was organized after the plant was decommissioned. **R. 3190–91 and 4367**.

The Wisconsin National Guard has performed helicopter training in part of what is now the recreation area for decades. **R. 38–40**. The training is typically conducted during the week, often in the evenings or at night, and includes tactical flight training, including flights at low levels and night vision flight training over the property. Pilots also practice landings, take-offs, picking up heavy loads (typically a concrete-filled barrel on a sling), and flying a designated loop route and then setting it back down at the same site. There are approximately eight flights per week using one or two helicopters, three to five days per week. **R. 3910**.

## B. GSA's decision to dispose of the land

In 2001, the General Services Administration (GSA) announced that the land that made up Badger Plant was available for disposal. **R. 3884.** The GSA prepared an environmental impact statement (EIS), considering different scenarios involving "low intensity use," "low/medium intensity use," and "medium intensity use." **R. 2528–30.** The EIS says that the property "is close to Devil's Lake State Park, [so] low intensity recreation use would be most appropriate under this land use. Low intensity uses would include passive or non-invasive nature based 'ecotourist' activities such as hiking and camping. Biking, horseback riding, snowmobiling, interpretive trails, and nature programs would also be included in this land use classification." **R. 1175–76**. After reviewing the final EIS, GSA issued a decision confirming that it had sufficiently analyzed the environmental impacts of the disposal and would proceed with disposal of the property. **R. 1607–13**.

## C. WDNR's application for the land

In 2004, the Wisconsin Department of Natural Resources (WDNR) submitted an application to acquire portions of the property through the Federal Lands to Parks Program, which is administered by the National Park Service (NPS). **R. 1614–34 and1640–61.** The

application contained what is called a Program of Utilization (POU), which described WDNR's proposed uses for the property:

> WDNR will develop and manage the land at Badger Army Ammunitions Plant for public recreational purposes. The property will be classified as a recreational area, and will include facilities for hiking, picnicking, primitive camping, Lake Wisconsin access and viewing, savanna and grassland restoration, environmental education and cultural/historical interpretation. . . . The specifics for how the property will be developed and managed will come from a master planning process WDNR is required to prepare. However, these are the types of uses we'd anticipate would come out of the planning process.

**R. 1650–51**.

In 2005, NPS sent a letter to GSA approving WDNR's application and requesting that the property be assigned to NPS for conveyance to WDNR.

**D. Transfer of the land to WDNR**

From 2009 to 2016, GSA assigned portions of the land to NPS for disposal, and NPS subsequently transferred those properties to WDNR. **R. 1973–2007 and 4562–93**. Each deed contained the restriction that the property "shall be used and maintained exclusively for public park or public recreation purposes for which it was conveyed in perpetuity." The deed also stated that the POU "may be amended from time to time at the request of either the Grantor or Grantee, with the written concurrence of the other party, and such amendments shall be added to and become a part of the original application." **R. 1976, 2023, 2544, 2567, 2735, 2762, 4530, and 4565**.

**E. Master plan**

After WDNR began to receive the property, it initiated the process of preparing a "master plan" for the recreation area. **R. 3881**. In December 2011, WDNR completed a "Rapid Ecological Assessment of the Area" that documented ecologically important areas, rare species,

and high-quality natural communities. **R. 2071**. The assessment included the following information:

> The Sauk Prairie Recreation Area (SPRA) supports numerous rare species. Thirty-three rare animal species are known from the SPRA, including four State Threatened and 29 Special Concern species. Seven rare plant species are known from the SPRA, including two State Endangered (one is also Federally Threatened) and five State Threatened species. . . .
>
> Biologists and birders are concerned about population declines of many grassland bird species. Since the North American Breeding Bird Survey (BBS) began in 1966, grassland birds have declined more steeply than any other group of birds in North America and the Midwest. The SPRA provides extensive surrogate grassland, shrubland, and savanna habitat for 97 confirmed or probable breeding bird species. This is an impressive list for an area the size of the SPRA, especially the number and diversity of grassland and shrubland birds (21 species).

**R. 2070**. The assessment identified the prairie bush-clover (Lespedeza leptostachya) as a federally listed threatened plant species that had been documented in the area. **R. 2091**. However, the plant had not been observed since 1993 and the area where it was found is now fenced off. **R. 1307–08**.

In August 2015, WDNR released a draft master plan for operation of the recreation area. **R. 3003 and 3021–33**. Among other things, the plan included proposals for dual-sport motorcycle access, a dog training and dog trialing area involving the discharge of firearms using blanks, helicopter training exercises by the Wisconsin Army National Guard, and unspecified "special uses." **R. 3003 and 3021–3033**.[1] In response to WDNR's draft, NPS wrote that

---

[1] Dog training is teaching dogs or exercising dogs for hunting game birds or mammals to improve their hunting performance. **R. 3905**. Dog trialing is not separately defined in the record, but WDNR says that it is an "organized, short-duration competition[] that test[s] dogs' hunting skills." Dkt. 64, at 21.

several of the proposed uses were not in the original application. As a result, WDNR would have to amend the POU and NPS would have to "consider proposed changes . . . and evaluate and disclose impacts from those uses." **R. 3405 and 3407**.

On November 8, 2016, WDNR issued a "Draft Master Plan and Final Environmental Impact Statement." **R. 3862–4103**. The revised plan contained descriptions of the proposed use and management of the property and some analysis regarding potential impacts, alternatives, and public input. **R. 3862–4103**. The proposed uses in this version of the plan included off-road motorcycle events, dog training, and helicopter training by the Wisconsin National Guard. The court will discuss each of these uses and their potential environmental impact in the analysis section of the opinion.

## F.  NPS approval of the plan

On December 1, 2016, NPS determined that it did not need to prepare an environmental impact statement (EIS) or an environmental assessment (EA), relying on a provision in its handbook that applies to "[c]hanges or amendments to an approved plan, when such changes would cause no or only minimal environmental impact." **R. 2659**. In concluding that neither an EIS nor an EA was needed, NPS relied on WDNR's findings in the master plan. **R. 4145–57**. NPS wrote, "we feel much of the impacts from the actions listed in the plan will be an improvement to the natural habitats and any potential negative impacts such as noise, air quality, impact to wildlife, will be minor," and that "[o]verall, through managed recreational opportunity and active land management activities, the overall quality of the natural environment at the park should improve." **R. 4156–57**.

On December 8, 2016, NPS informed WDNR that once the Wisconsin Natural Resources Board approved the plan, NPS "will consider the plan to be an amendment to the

Program of Utilization (POU) contained in the state's application for the property and referenced in the deeds which transferred the property to the state and will guide the development of the site going forward." **R. 4181**. On December 14, the board approved the plan, but deleted a provision that would have allowed high-powered rocket usage on a few days each year. **R 4559–64**. At this point, NPS had transferred all but three parcels to WDNR. **R. 3876**.

## G. Final deed

On December 15, 2016, NPS executed a deed that conveyed a 75-acre parcel (Parcel V1) to WDNR but permitted the Wisconsin Army National Guard to use the parcel for helicopter training in accordance with the master plan. **R. 4565**. (The two other remaining parcels are not at issue in this case.) The final deed included the following provision: "[I]f requested by WDNR or by the Governor of the State of Wisconsin, the Wisconsin National Guard may enter into an agreement with WDNR to utilize Parcel V1 for rotary wing aviation training conducted in a manner that is consistent with WDNR's approved Master Plan for the Property." *Id.*

WDNR and the National Guard have entered into a "memorandum of understanding" governing helicopter training at the recreation area. **R. 3910–11 and 4162–66**. The memorandum contains a map designating a primary flight path, **R. 4166**, as well as flight restrictions, **R. 4162–63**.

ANALYSIS

**A. Standing**

One of the jurisdictional prerequisites to filing a lawsuit in federal court is standing to sue under Article III of the U.S. Constitution. The doctrine of constitutional standing requires the plaintiff to show that it has suffered an "injury in fact" that is "fairly traceable" to defendants' conduct and capable of being redressed by a favorable decision from the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). None of the parties discuss the issue of standing, so it appears that defendants concede that the Alliance has it. Nevertheless, the court has an independent obligation to consider the issue. *DeBartolo v. Healthsouth Corp.*, 569 F.3d 736, 740 (7th Cir. 2009).

"An organization has standing to sue if (1) at least one of its members would otherwise have standing; (2) the interests at stake in the litigation are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires an individual member's participation in the lawsuit." *Sierra Club v. Franklin Cty. Power of Ill., LLC*, 546 F.3d 918, 924 (7th Cir. 2008). As to the first requirement, the Alliance has submitted affidavits from several of its members. Dkts. 50–56. For example, member Charles Luthin avers that he "regularly use[s] the [Sauk Prairie State Recreation Area] for recreational purposes," such as hiking and bird watching, and that "the proposed high-impact uses conflict loudly with" his "quiet recreation." Dkt. 54, ¶¶ 9–10. The other members make similar statements, none of which defendants challenge. Although the members could have provided more specific details regarding how the proposed uses will affect them, it is reasonable to infer from the affidavits that the proposed uses will diminish the members' enjoyment of the recreation area, which is all that is required for an individual to show an injury in this context. *Am. Bottom Conservancy*

*v. U.S. Army Corps of Eng'rs*, 650 F.3d 652, 658 (7th Cir. 2011) ("[I]t is enough to confer standing that their pleasure is diminished even if not to the point that they abandon the site. For that diminution is an injury.") (citations omitted). Because it is also reasonable to infer that the members' injuries are fairly traceable to defendants' conduct and success in this lawsuit would redress those injuries, the Alliance has satisfied the first requirement of organizational standing.

The Alliance satisfies the other two requirements of organizational standing as well. The Alliance was formed to protect the Sauk Prairie State Recreation Area, so the interests at stake in the litigation are germane to the organization's purpose. And the court sees no reason why the members would need to bring the claims in this case as individuals rather than through the Alliance. The court concludes that the Alliance has constitutional standing to sue.

## B. Standard of review under the Administrative Procedure Act

The Alliance contends that defendants have violated the Federal Property and Administrative Services Act of 1949 (FPASA) and the National Environmental Policy Act (NEPA), but the Alliance does not contend that either statute creates a private right of action. Rather, the parties appear to agree that judicial review for violations of both statutes is provided under the Administrative Procedure Act. *See Milwaukee Inner-City Congregations for Hope v. Gottlieb*, No. 12-cv-556-bbc, 2013 WL 12234624, at *3 (W.D. Wis. Jan. 29, 2013) ("[T]he National Environmental Policy Act does not confer a private right of action at all. Rather, judicial review of agency action under the National Environmental Policy Act is governed by the Administrative Procedures Act."); *Conservation Law Found. of New England, Inc. v. Harper*, 587 F. Supp. 357, 366–67 (D. Mass. 1984) ("[Plaintiffs] do not have a private right of action under the FPAS," but "Plaintiffs' claims that defendants have failed to comply with the FPAS

may be construed . . . as arising under the APA."). An agency decision may be set aside under the APA if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.*, 673 F.3d 518, 525 (7th Cir. 2012).

## C. Federal Property and Administrative Services Act

"Under the Federal Property and Administrative Services Act of 1949 ('FPASA'), the Administrator of General Services is entrusted with the broad task of supervising and directing the disposition of surplus property, which includes any excess property not required for the needs of any federal agency." *Grammatico v. United States*, 109 F.3d 1198, 1201 (7th Cir. 1997) (citing 40 U.S.C. § 484(a) and § 472(g)). At issue in this case is 40 U.S.C. § 550(e), which allows GSA to "assign to the Secretary of the Interior for disposal surplus real property . . . that the Secretary recommends as needed for use as a public park or recreation area." The Alliance contends that defendants have violated FPASA in two ways: (1) defendants allowed the recreation area to be used for helicopter training, which is not a recreational use; (2) defendants' approval of the area for all of the disputed uses is inconsistent with the purposes for which the property was conveyed to the state.

### 1. Zone of interests

Another threshold question that the parties do not address is whether the Alliance's claims fall within the "zone of interests" of FPASA, a question raised in every case brought under the APA. *Am. Fed'n of Gov't Emps., Local 2119 v. Cohen*, 171 F.3d 460, 465 (7th Cir. 1999) ("Those seeking judicial review of administrative actions under the APA must show that they have . . . an interest falling within the 'zone-of-interests' protected by the relevant statutes."). In one of the few judicial decisions interpreting FPASA, the Court of Appeals for the First

Circuit held that area residents who objected to the sale of federal land to an electric utility that planned to build a nuclear power plant did not fall within FPASA's zone of interests. *Rhode Island Comm. On Energy v. Gen. Servs. Admin.*, 561 F.2d 397, 402 (1st Cir. 1977) ("Nowhere in the FPAS statute or in the committee reports accompanying its 1949 enactment and 1952 amendments can we discern any congressional solicitude for the interests of abutters or nearby residents of real property which has become excess or surplus.") (footnote omitted). The parties do not address this decision in their briefs.

But *Rhode Island* may no longer be good law. In recent years, the Supreme Court has stated that the zone of interests test "is not meant to be especially demanding" and must be applied in light of the rule that the APA makes agency action presumptively reviewable. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (internal quotations omitted). The test is satisfied if the plaintiff is "arguably" within the zone of interests, even if there is no evidence of a congressional purpose to benefit the plaintiff. *Id.* "The test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* (internal quotations omitted).

Although *Patchak* did not involve FPASA, the case is instructive. The Court held that a neighboring landowner could use the APA to challenge a federal agency's decision to purchase property because the landowner alleged that the decision would "cause him economic, environmental, and aesthetic harm as a nearby property owner," *id.* at 224, which is similar to the Alliance's alleged harm in this case.

In any event, the zone of interests requirement is an element of prudential standing, not constitutional standing, *Bennett v. Spear*, 520 U.S. 154, 162, (1997), which means that it

can be waived. *RK Co. v. See*, 622 F.3d 846, 851-52 (7th Cir. 2010) ("Prudential standing issues are subject to waiver."); *In re Ray*, 597 F.3d 871, 875 (7th Cir. 2010) ("[N]onconstitutional or prudential lack of standing may be waived by a party that fails to timely raise the issue."). "[T]he court may raise an unpreserved prudential-standing question on its own, but unlike questions of constitutional standing, it is not obliged to do so." *Rawoof v. Texor Petroleum Co.*, 521 F.3d 750, 757 (7th Cir. 2008). In light of the uncertainty in the law on this issue and defendants' failure to raise it, the court will assume that the Alliance's claim falls within FPASA's zone of interests.[2] The court will turn to the merits of the Alliance's FPASA claims.

## 2. Helicopter training

The Alliance says that helicopter training is not a recreational use and that § 550(e) prohibits any portion of the land from being used for a nonrecreational purpose. Missing from the Alliance's briefs is any discussion of how defendants violated any of FPASA's requirements. Instead, the Alliance's arguments focus on various other documents in which either the federal or state government represented that the property would be used for recreational purposes. But the Alliance does not explain why any of those documents would be enforceable under FPASA, so any argument that relies on these documents is forfeited.

Section 550(e)(4) is the only part of § 550(e) that addresses the content of a deed:

> Deed of conveyance.--The deed of conveyance of any surplus real property disposed of under this subsection--
>
> (A) shall provide that all of the property be used and maintained for the purpose for which it was conveyed in perpetuity, and that if the property ceases to be used or maintained for that purpose,

---

[2] For the same reasons, the court will assume that the Alliance's claims under NEPA fall within the zone of interests of that statute as well.

> all or any portion of the property shall, in its then existing condition, at the option of the Government, revert to the Government; and
>
> (B) may contain additional terms, reservations, restrictions, and conditions the Secretary of the Interior determines are necessary to safeguard the interests of the Government.

Section 550(e)(4) does not require the government to reserve all of the property being transferred for a particular use. Rather, it says that the deed must require the property to "be used and maintained for the purpose for which it was conveyed in perpetuity." In this case, it is undisputed that the deed for the parcel on which the helicopter training will be performed allows WDNR to enter into an agreement with the Wisconsin National Guard for "aviation training." **R. 4565**.[3]

In any event, the Alliance ignores § 550(e)(4)(B), which expressly allows the government to include reservations in the deed that are "necessary to safeguard the interests of the Government." Defendants say that "[t]he reserved helicopter use in the deed serves the United States' defense and safety interest by ensuring a well-trained state National Guard which has both a federal and a state mission." Dkt. 63, at 12 (citing **R. 4168**). Because the Alliance does not even respond to this argument in its reply brief, the court concludes that the

---

[3] Although the deed also says that the parcel will be used "exclusively for public park or public recreation purposes," **R. 4565**, the Alliance does not develop an argument that any inconsistency in the document would require the court to disregard the provision that allows helicopter training. *Boatmen's Nat. Bank of St. Louis v. Smith*, 835 F.2d 1200, 1203 (7th Cir. 1987) ("Where the document contains both general and specific provisions relating to the same subject, the specific provision controls.").

Alliance has failed to show that allowing part of the recreation area to be used for helicopter training violates FPASA.

### 3. Other challenged uses

The Alliance contends that FPASA prohibits defendants from approving any uses that were not identified in the original "program of utilization" that WDNR submitted with its application for the land. This contention has two problems. First, the document the Alliance cites does not prohibit uses such as dog training or motorcycle events. Although the document says that WDNR "anticipate[s]" that the area will include facilities for activities such as "hiking, picnicking, primitive camping, Lake Wisconsin access and viewing, savanna and grassland restoration, environmental education and cultural/historical interpretation," **R. 1650**, the document also says that "[t]he specifics for how the property will be developed and managed will come from a master planning process WDNR is required to prepare." **R. 1651**.

Second, and more important, the Alliance again fails to explain how FPASA supports the claim. The Alliance cites the language in § 550(e)(4)(A) that the property must "be used and maintained for the purpose for which it was conveyed in perpetuity." But that language relates to the requirements of the *deed*, not the "program of utilization," which is not a document discussed in the statute. And the only limitation cited by the parties in the deeds is that the property "shall be used and maintained exclusively for public park or public recreation purposes." Because the Alliance concedes that all of the uses in dispute are "recreational" (other than the helicopter training, which is permitted for the reasons discussed above), those uses are permitted under the deed and also under § 550(e)(4)(A).

**D. National Environmental Policy Act**

**1. Legal standard**

The Alliance does not contend that NEPA prohibited defendants from approving any of the uses in dispute. Rather, the Alliance's claim is that NPS failed to adequately consider the environmental impact that the disputed uses would have before approving WDNR's plan. This is because "NEPA . . . does not mandate particular results. It simply prescribes the necessary process." *Envtl. Law & Policy Ctr. v. U.S. Nuclear Regulatory Comm'n*, 470 F.3d 676, 682 (7th Cir. 2006) (citation omitted). The purpose of the law is to foster public comment and help the agency make an informed decision about the environmental consequences of its actions. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004). *See also Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989) ("NEPA merely prohibits uninformed—rather than unwise—agency action.").

NEPA requires a federal agency to prepare an environmental impact statement (EIS) for all "proposals for . . . major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Obviously, the agency must determine whether its action will "significantly" affect the environment *before* deciding whether to prepare an EIS and there are two ways an agency can make that determination. First, the agency can prepare an "environmental assessment" (EA), which is "a shorter, rough-cut, low-budget EIS." *Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 953 (7th Cir. 2003). Second, the agency can decide that the action falls within a "categorical exclusion," so it does not require either an EIS or an EA. *Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.*, 673 F.3d 518, 525 (7th Cir. 2012).

In this case, the parties assume that the land transfers at issue were "major federal actions." The question is whether NPS erred in concluding that WDNR's plan for the recreation area was categorically excluded from the requirement to prepare an EIS.[4]

The statute does not define the term "categorical exclusion." There is a definition in the regulations, but it is somewhat circular:

> Categorical exclusion means a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§ 1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required. . . . Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.

40 C.F.R. § 1508.4. Thus, a categorical exclusion may apply when an action will not have a significant environmental impact, which is essentially the same standard that governs whether an EIS is required. D. Mandelker, *NEPA Law and Litigation* § 7:10 (2017) ("The effect of this method of defining categorical exclusions is to apply the same criteria for determining whether an impact statement is necessary to the categorical exclusion decision.").

NPS has its own guidelines, but they do not provide much more specificity, at least for the purpose of this case. NPS relies on a categorical exclusion in its handbook that applies to "[c]hanges or amendments to an approved plan, when such changes would cause no or only minimal environmental impact." **R. 2659**. The parties debate whether the NPS guidelines impose a stricter standard than the regulation, that is, whether there is a difference between a

---

[4] WDNR prepared a state version of an EIS, but defendants do not contend that WDNR's EIS qualifies as an EIS under NEPA.

"significant environmental effect" and a more than "minimal environmental effect." For the purpose of this decision, the court will assume that "minimal environmental effect" is the appropriate standard.

The parties do not cite any cases from this circuit in which a court considered whether it was appropriate for an agency to invoke a categorical exclusion. But both the Supreme Court and the court of appeals have consistently held that the APA's "arbitrary and capricious" standard applies to alleged NEPA violations in similar contexts. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 763 (2004) (decision to prepare an EA instead of an EIS); *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1075 (7th Cir.), *cert. denied sub nom. Citizens for Appropriate Rural Roads, Inc. v. Foxx*, 137 S. Ct. 310 (2016) (decision whether to supplement EIS).

In the context of a case in which a plaintiff challenged an agency's decision to prepare an EA instead of an EIS, the court of appeals described the arbitrary and capricious standard as follows:

> [O]ur inquiry is searching and careful but the ultimate standard of review is a narrow one. We only must ask whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. If an agency considers the proper factors and makes a factual determination on whether the environmental impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference. In the context of NEPA, arbitrary and capricious review prohibits a court from substituting its judgment for that of the agency as to the environmental consequences of its actions. In fact, the only role for a court in applying the arbitrary and capricious standard in the NEPA context is to insure that the agency has taken a hard look at environmental consequences.

*Highway J*, 349 F.3d at 952–53 (internal quotations, citations, and alterations omitted). *See also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its

action including a rational connection between the facts found and the choice made.") (internal quotations omitted).

Courts considering a NEPA challenge "do not approach th[e] dispute as a panel of environmental experts attempting to decide which party is correct." *Highway J*, 349 F.3d at 955. The court of appeals emphasized the same point in *Indiana Forest Alliance, Inc. v. U.S. Forest Serv*ice, stating that "the fact that the record also contains evidence supporting a different scientific opinion does not render the agency's decision arbitrary and capricious," so long as the agency's finding "is based upon adequate data." 325 F.3d 851, 861 (7th Cir. 2003) (internal quotations omitted).

### 2. Challenged uses

The Alliance contends that that NPS failed to adequately consider the environmental impacts of three types of proposed uses: (1) helicopter training; (2) off-road motorcycle events; and (3) dog training. The Alliance also mentions dog trialing but does not discuss that activity separately from dog training. And the Alliance does not respond to WDNR's contention that dog trialing is not at issue because it is not a preapproved use under the master plan and cannot be approved without a special permit that takes into consider the environmental impact of the activity. Accordingly, any challenge to dog trialing—as distinct from dog training—is forfeited. The court will consider the other three proposed uses in turn.

NPS acknowledges that it relied primarily on the findings in WDNR's master plan to determine whether a categorical exclusion should apply. The parties assume that it was not inappropriate for NPS to do that, so the court will make the same assumption and consider the master plan on its own merits.

### a. Appropriate baseline

There is a threshold question regarding how NPS should have measured any potential impact of the proposed uses. Defendants say that the appropriate baseline was the condition of the environment at the time the use was approved. The Alliance says that the appropriate baseline is what the condition of the environment *would have been* under the original "program of utilization." The Alliance's logic is that the challenged uses were not included in the program of utilization and were added later as an amendment, so the original proposal should control. The Alliance does not say in its briefs why the baseline is important, but presumably the Alliance's view is that the original proposal did not allow as many uses (including helicopter training), so environmental conditions would have improved under that plan.

As with many of the Alliance's arguments, the problem with this logic is that it is not tied to the statute at issue. NEPA directs the agency to determine whether its actions will "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(2)(C). The regulation governing categorical exclusions similarly directs the agency to consider whether its actions will have "a significant effect on the human environment." Both the statute and the regulation presuppose that the agency will determine the effect on the environment as it actually exists.

The original program of utilization never took effect, so it had no impact on the environment. How would NPS determine the impact of the master plan on a set of conditions that never occurred? Was NPS supposed to speculate what the conditions would have been under the original program of utilization at some undetermined point in the future and then speculate as to how the disputed uses would affect those conditions? The Alliance does not explain why that would be logical or how it would even be possible.

The Alliance relies on the language of the particular categorical exclusion that NPS invoked, but it provides no support for the Alliance's view. The exclusion applies to changes that will have no more than a minimal environmental impact. Nothing in the exclusion suggests that the NPS should engage in a counterfactual exercise regarding the impact of changes on a set of ecological conditions that might have existed under a plan that never took effect.

The Alliance also cites language in the NPS handbook:

> Our environmental analysis will be focused on the new proposed uses (primarily active recreation uses) that are different from the ones in the original application, as the original passive uses were previously considered in the original land disposal for SPRA . . . . In our environmental reviews, the NPS typically evaluates the 'no action' alternative, meaning the continuation of current management practices or the current plan.

**R. 3407–08.** The Alliance says that the cited language supports its view, but that would be the case only if "no action" and "baseline" meant the same thing. As NPS points out, the handbook treats the two concepts as distinct: "the no-action alternative is different than the baseline used for predicting changes to the conditions of resources." **R. 2681**. According to the handbook, "[t]he current state of the resources affected serves as the baseline for predicting changes to the human environments that could occur if any of the alternatives under consideration, including the no-action alternative, are implemented." *Id.* In accordance with the statute, regulation, and handbook, the court concludes that the appropriate baseline for determining the impact to the environment is the condition of the environment at the time NPS approved the conditions.

### b. Helicopter training

The Alliance objects to helicopter training on the ground that it will generate substantial noise and wind. NPS says that the helicopter training "was properly excluded from the analysis of environmental impacts" because the training was a "right reserved in the deed [to Parcel V1]

20

and therefore the Park Service did not have jurisdiction to review and concur in it." Dkt. 65, at 21. The court would be inclined to agree. But even setting that point aside, the Alliance's challenge to the helicopter training fails because the training has been occurring for decades. Although the original proposal excluded helicopter training as a use, as noted above, the original proposal never went into effect, so that training was already taking place when WDNR prepared the master plan. Whatever effect the helicopters have on the environment has already occurred.

The Alliance points to no evidence that the amount of training is likely to increase or that the response of the area wildlife to the helicopters is likely to change in any way. Also, helicopter training is limited, as to area (take off and landing are restricted to one parcel of land that is closed to the public and pilots must follow a restricted flight path that "avoid[s] over flight of people and livestock below 500 feet"), timing (flights are not permitted during deer-hunting season, on the weekends or before 10 a.m.), and volume (the number of flights is limited "to reduce the noise signature to the area"). **R. 3910 and 4162–63**. The court sees no reason that NPS should have concluded that continuing the use of the helicopters will have any additional impact on the environment.

### c. Off-road motorcycle events

The Alliance says that that NPS failed to adequately consider several potential environmental effects of the off-road motorcycle events: (1) the noise caused by the motorcycle engines; (2) pollution from emissions; (3) dust generated on the trails; and (4) harm to local wildlife, especially grassland birds in the area where some of the trails are planned. The last issue is related to the first three because the Alliance's allegations about harm to wildlife are based primarily on their allegations about the other issues.

In arguing that the environmental effects from the motorcycles will be more than minimal, the Alliance relies primarily on language in the master plan itself:

- sound level on the trails may be "higher" or even "considerably higher" than the sound level on the roads in and around the park. **R. 4008 and 4015**; the sound "may cause displacement, nest desertion [and] breeding failure" and "may also result in animals being displaced for longer periods than just the days that the motorcycles are using the repurposed trails," **R. 4015**;

- "dust is likely to be created during dual-sport motorcycle events," **R. 4006**;

- "exhaust from the motorcycles could impact sensitive species," **R. 4015**.

The problem with relying on the master plan is that, after acknowledging these potential issues, WDNR identified numerous restrictions that it is placing on the use of the motorcycles to minimize any impact. The motorcycles will be permitted in the area only *six days a year* and on no more than two consecutive days. Only two of the six days may fall between April 15 and July 31, which is the nesting period for birds. The motorcycles are limited to 50 percent of the trails designated for bicycling or horse riding. On the days when motorcycles are permitted, they will be restricted to the hours between 9:00 a.m. and 4:00 p.m. Participation is limited to 100 riders. All motorcycles will have to undergo noise testing, with a limit of 96 decibels. In addition to these required limitations, WDNR reserves the right to set additional restrictions on particular events to prevent any impact to the recreation area. **R. 4014–15**.

WDNR also provided comparisons for context. For example, it estimated that the motorcycles will generate emissions from approximately 100 gallons of gas on the days that they are permitted. This compares to emissions from an estimated 1,660 gallons of gas from vehicles driving on roads surrounding the recreation area. **R. 4006**. As a result, WDNR estimated that the motorcycles' effect on air quality will be "minimal." *Id.*

As to the effect on grassland birds in particular, WDNR noted that most of the "high-priority" habitat for grassland birds has been transferred to the Ho-Chunk Nation and is not part of the recreation area. **R. 2096 and 3877**. Of the habitat that remains in the recreation area, some of it "was heavily disturbed during plant operations and was used primarily in the production of rocket propellant and related materials. Hundreds of structures and dozens of miles of roads were constructed [t]here. Much of the topography and soils were altered during construction and deconstruction (e.g., contaminated ditches were dug out and filled)." **R. 3948.** WDNR's goal is to *improve* and further restore the habitat to make it more hospitable for grassland birds by controlling woody invasive species and establishing native grasslands. *Id.* Although there are some trails in the habitat, they are placed "around the exterior of [the habitat] to create an interior core of contiguous habitat for grassland birds." Dkt. 64, at 18 (citing **R. 3948**). As a result of its restoration efforts, WDNR anticipates that its plan will lead to "substantial and long-term *increases* in populations of native species." **R. 3873** (emphasis added).

The Alliance does not respond to WDNR's argument about the grassland birds in its reply brief, so the court assumes that the Alliance has abandoned its argument on that issue. The Alliance does challenge the view that the restrictions WDNR has imposed will be sufficient to prevent adverse environmental impacts. The Alliance's primary argument is that defendants have not adequately explained how the restrictions will prevent adverse environmental impact.

The court disagrees for two reasons. First, WDNR did provide some data in the master plan to support its conclusions. For example, the master plan discusses research related to the effect that motorized traffic can have on the number and diversity of species in the area. **R. 4014**. The research showed a "correlation between the volume of traffic and the level of

impact." *Id.* The plan cites data from the Bong State Recreation Area, which allows ATV and off-road motorcycle riding. According to that data, there did not "appear to be a sizeable reduction in the number of species or number of birds in the area where motorized recreation is allowed compared to other areas of the property. Rather, the distribution of birds appears more influenced by the type and quality of habitats present." *Id.* This data supports WDNR's conclusion that limited off-road motorcycle events will have no more than a minimal effect on the environment.

Second, "inherent in NEPA and its implementing regulations is a 'rule of reason,' which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process. Where the preparation of an EIS would serve 'no purpose' in light of NEPA's regulatory scheme as a whole, no rule of reason worthy of that title would require an agency to prepare an EIS." *Pub. Citizen*, 541 U.S. at 767–68 (citations omitted). In other words, both federal agencies and courts reviewing agency decisions under NEPA must take a pragmatic approach and consider the likelihood that requiring the agency to go through the additional time, effort, and expense of collecting more data will lead to useful information. *River Rd. All. v. Corps of Eng'rs of United States Army*, 764 F.2d 445, 449 (7th Cir. 1985) ("[T]he purpose of an environmental assessment is to determine whether there is enough likelihood of significant environmental consequences to justify the time and expense of preparing an environmental impact statement."). Courts must "take care to distinguish between claimed deficiencies . . . that are 'merely flyspecks' and those that are 'significant enough to defeat the goals of informed decisionmaking and informed public comment.'" *Habitat Educ. Ctr.*, 673 F.3d at 528 (quoting *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1163 (10th Cir. 2002)).

In the context of categorical exclusions in particular, courts have held that "[d]ocumentation of reliance on a categorical exclusion need not be detailed or lengthy. It need only be long enough to indicate to a reviewing court that the agency indeed considered whether or not a categorical exclusion applied and concluded that it did." *Wilderness Watch & Pub. Emps. for Envtl. Responsibility v. Mainella*, 375 F.3d 1085, 1095 (11th Cir. 2004). A more burdensome requirement would defeat the purpose of categorical exclusions, which is "to streamline procedures and reduce paperwork and delay." *Id.*

The Alliance is correct that defendants did not cite any studies that considered the effect that dust generated by the motorcycles would have on the environment. But at the same time, the Alliance has not provided any basis for believing that it *will* have a harmful effect. WDNR has placed such significant restrictions on the use of motorcycles that it is not unreasonable—in the absence of evidence to the contrary—to find that any environmental effects will be minimal. Even the authority that the Alliance cites says that a plaintiff must show that there are "substantial questions whether a project may have a significant effect on the environment" to successfully challenge an agency's invocation of a categorical exclusion. *Anderson v. Evans*, 314 F.3d 1006, 1017 (9th Cir. 2002). The Alliance has not shown that. Even if the court assumes that the master plan suggests that the motorcycles will have *some* adverse impact on the environment, that is not the standard. It was not arbitrary and capricious for NPS to conclude that there would be no more than minimal effects on the environment.

For the sake of completeness, the court will address one other issue that the Alliance raises in its briefs regarding off-road motorcycle events. The Alliance says that it was not reasonable for WDNR to rely on data for automobile emissions to support a conclusion that emissions from dual-sport motorcycles would not have more than a minimal effect on air

quality. Although it is true that WDNR did not cite data showing "what pollutants are emitted by dual-sport motorcycles," Dkt. 48, at 33, the Alliance does not allege that the pollutants are any different from automobiles and it provides no grounds for inferring that 100 dual-sport motorcycles will have any greater effect on the environment than the more than 10,000 vehicles (which may include dual-sport motorcycles) that pass by the recreation area each day. **R. 4006**.

### d. Dog training

One portion of the recreation area will be designated as a dog training ground. **R. 3905**. The Alliance does not contend that the dogs themselves will have any adverse environmental effects. Instead, the Alliance focuses on the discharge of firearms (using blanks) that may occur during the training, alleging that the noise could disrupt breeding of animals in the area.

NPS's conclusion that the dog training would not have more than a minimal impact on the environment was not arbitrary and capricious. First, dog training is limited to a 72-acre portion of the recreation area, which covers 3,385 acres. **R. 3905**. That in itself substantially limits the impact that dog training might have on wildlife in the recreation area. The Alliance does not identify any sensitive species that are concentrated in the two percent of the recreation area that will allow dog training.

Second, the Alliance does not challenge various findings in the master plan that support NPS's conclusion: (1) based on WDNR's experience with 50 other sites in the state that allow dog training, WDNR anticipates that "the use level of at any given time at training grounds" will be "low" because "people prefer to train their dogs with few distractions," **R. 4023**; (2) the discharge of firearms during dog training will be "occasional," **R. 4018**; (3) the dog training area abuts a highway, **R. 4094**, which generates its own noise; and (4) the effect of firearms used in training will be "similar to the impacts that occur from hunting." **R. 4018**.

The last finding is particularly noteworthy. Hunting is also permitted in the recreation area, **R. 3903–04**, and the Alliance is not challenging that use. In fact, the Alliance classifies hunting as "low-impact recreation." Dkt. 48, at 17. The Alliance fails to explain why the occasional discharge of firearms is "low-impact" in the context of hunting but harmful in the context of dog training.

The only evidence the Alliance cites in favor of a conclusion that dog training will have an adverse environmental impact is an "expert sound study" the Alliance submitted that concluded that a rifle range would have "immediate adverse impacts on current breeding populations of vireos, meadowlarks, grosbeaks, warblers, and grassland sparrows, and will prohibit any re-establishment of former breeding populations of upland sandpipers." **R. 3207**. But the reasons why the study is not probative are obvious. There will be no rifle range at the recreation area and the Alliance provides no basis for concluding that effects of a shooting range would be similar to the effects of dog training. The study itself relies on a view that "rifle ranges are traditionally highly trafficked sites in Wisconsin," **R. 3213**, which alone distinguishes a range from WDNR's description of dog training areas in the state. Particularly because the Alliance does not even attempt to challenge the finding that dog training and hunting have similar effects on the environment, the study does not render the NPS's decision arbitrary and capricious.

E. **Conclusion**

The Alliance has failed to show either that: (1) NPS lacked authority under FPASA to approve helicopter training, dual-sport motorcycle events, and dog training and trialing at the Sauk Prairie State Recreation Area; or (2) it was arbitrary and capricious for NPS to decide

that an EIS was not needed. Accordingly, the court will grant defendants' motion for summary

judgment.

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment, Dkt. 61, is GRANTED and plaintiff Sauk Prairie Conservation Alliance's motion for summary judgment, Dkt. 47, is DENIED.

2. The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered May 3, 2018.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge